UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFREY DUBNOW, M.D., | |
| Plaintiff, | |
| v. | Case No.: 1:22-cv-05580 |
| DENIS MCDONOUGH, Secretary of Veteran Affairs, U.S. Department of Veteran Affairs. | Hon. Jorge L. Alonso |
| Defendant. | |

## DR. DUBNOW'S BRIEF IN SUPPORT OF HIS APPEAL OF THE DEPARTMENT OF VETERAN AFFAIRS' SEPTEMBER 6, 2022 DECISION

Michael Frisch
CROKE FAIRCHILD DUARTE & BERES LLC
180 N. LaSalle St., Ste. 2750
Chicago, IL 60601
(847) 530-7419
mfrisch@crokefairchild.com

Alan Nicgorski
HANSEN REYNOLDS LLC
150 S. Wacker Dr., 24th Fl.
Chicago, IL 60606
(312) 265-2252
anicgorski@hansenreynolds.com

Neil Lloyd
ARENTFOX SCHIFF
233 S. Wacker Dr., St. 7100
Chicago, IL 60606
(312) 258-5628
neil.lloyd@afslaw.com

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................................1

II.     BACKGROUND ..............................................................................................................5

    A.    Dr. Dubnow's Pre-Termination Career............................................................................5

    B.    The April 29, 2017 Incident................................................................................................6

    C.    Dr. Dubnow's Termination .................................................................................................8

    D.    The Disciplinary Appeals Board's Reversal of the Termination................................8

    E.    The DUSH's Remand and Subsequent Reversal on Charge 1 ................................10

    F.    The Seventh Circuit's Reversal of the DUSH's December 10, 2018 Decision.....................13

    G.    The DUSH Ignores the Seventh Circuit, Reversing the DAB a Second Time.....................15

III.    ARGUMENT ................................................................................................................16

    A.    The DUSH Failed to Apply the "Clearly Contrary to the Evidence Standard." ..................16

    B.    The DAB's Decision Did Not Conflict With the Weight of the Evidence. .........................18

    C.    The DUSH Failed to Evaluate Dr. Dubnow's Conduct Against the Community Standard of Care..................................................................................................................................21

IV.    CONCLUSION ............................................................................................................22

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE**

*Creek v. Vill. of Westhaven,*
  144 F.3d 441 (7th Cir. 1998)............................................................................................................15

*Dubnow v. McDonough,*
  30 F. 4th 603 (7th Cir. 2022)....................................................................................................passim

*Savu v. United States,*
  No. SA-18-CV-00993-JKP-ESC, 2021 WL 1615562 (W.D. Tex. Apr. 26, 2021) .................... 14, 15

*United States v. Sung,*
  87 F.3d 194 (7th Cir. 1996) ...................................................................................................... 4, 22

**STATUTES**

38 U.S.C. § 7401............................................................................................................................9
38 U.S.C. § 7461..................................................................................................................... 8, 9
38 U.S.C. § 7462.....................................................................................................................passim
38 U.S.C. § 7464............................................................................................................................9

## I.     <u>INTRODUCTION</u>

This is a straightforward action for administrative review of an adverse personnel decision by the Department of Veterans Affairs ("VA"). Though it should not be, it is before this Court for the second time. It should not be because the Seventh Circuit vacated the VA's original termination decision based on the VA's failure to apply the Congressionally mandated "clearly contrary to the evidence" standard when the VA overturned a recommendation of reinstatement by the VA's own Disciplinary Appeals Board ("DAB"). It should not be because the VA then ignored the Seventh Circuit's clear directions — interpreting the controlling statute and furnishing the law of the case to apply to the proceedings going forward. It has been nearly six years since the incident that gave rise to this action and which cut short, without justification, an unblemished career. It is time for the matter to conclude, with the Plaintiff's full reinstatement.

On April 29, 2017, Plaintiff Jeffrey Dubnow, M.D. ("Dr. Dubnow"), then the chief of the Emergency Department at the Captain James A. Lovell Federal Health Care Center ("FHCC") in North Chicago, Illinois, a joint facility of VA and the Department of Defense, made the split-second decision to divert an en route ambulance carrying an infant in cardiorespiratory arrest to nearby Lake Forest Hospital – a Level II trauma center with superior pediatric capabilities. Tragically, the infant could not be resuscitated either en route or upon arrival at Lake Forest Hospital. The VA investigated, and, on December 24, 2017, terminated Dr. Dubnow's employment based on the charge that he had *inappropriately* refused care to the infant by diverting the ambulance.

Under 38 U.S.C. § 7462, Dr. Dubnow appealed his termination to a DAB. The DAB – comprised of three VA physicians of equal or superior grade to Dr. Dubnow – found that, based on the information known to him at the time, Dr. Dubnow acted appropriately in re-directing the ambulance, and that his decision met the community standard of care. The DAB's decision should have ended this matter, and Dr. Dubnow should have been restored to his position.

1

Instead, the Deputy Undersecretary for Health ("DUSH") overturned the DAB's ruling and upheld Dr. Dubnow's termination.[1] Under 38 U.S.C. § 7462(d), the DUSH may reverse a DAB decision *only if* the decision is "clearly contrary to the evidence or unlawful." In a brief decision bereft of analysis, the DUSH overturned the DAB's decision on the ground that the FHCC possessed the minimum capabilities to treat the patient and thus "there was *no need* to divert the ambulance to another facility." AR_2183 (emphasis added).)[2] The DUSH did so even though the charge against Dr. Dubnow was not whether there *was a need* to divert the ambulance, but rather whether the diversion was *inappropriate*.[3] And the DUSH did so even though the question was not whether the DUSH agreed with the DAB, but rather whether the DAB's own decision was clearly contrary to the evidence.

Dr. Dubnow sought judicial review of the DUSH's decision under 38 U.S.C. § 7462(f)(1). This Court affirmed. Dr. Dubnow appealed and the Seventh Circuit reviewed the DUSH's decision *de novo*. *Dubnow v. McDonough*, 30 F. 4th 603, 609 (7th Cir. 2022). In an issue of first impression, the Seventh Circuit held that Section 7462(d)'s "clearly contrary to the evidence standard" meant that the DUSH could reverse a DAB decision *only if* "it would be obvious to an ordinary person that the DAB's decision conflicted with the weight of the evidence." *Id.* at 611. Applying this standard, the court held that the initial reversal of the DAB was "arbitrary and capricious" because the DUSH did not apply the deferential standard at all, instead improperly substituting his judgment for that of the DAB. *Id.*

The Seventh Circuit remanded the case to the VA so that it could reconsider its termination decision using the correct legal standard. In doing so, the court directed the VA on remand to focus

---

[1] The VA advises that the person who made the final administration determination is the "Deputy Under Secretary for Health ("DUSH"), not the Principal Deputy Under Secretary for Health ("PDUSH"), as previously named. We use DUSH herein, except when quoting from prior decisions.

[2] The Government filed the Administrative Record in this case as Dkt. 12. All cites to the Administrative Record are "AR__."

[3] Under the statute, Dr. Dubnow could not have faced an adverse personnel action based on an exercise of his professional judgment *unless* the VA set out the specific charge of alleged misconduct. It did so, contending that the basis was an inappropriate diversion, not an unnecessary one.

on the relevant question – "whether diversion [of the ambulance] was *appropriate*," and not, as the DUSH did originally, on whether "there *was a need* to divert the ambulance." *Dubnow*, 30 F. 4th at 611 (emphases added). Further, "[i]n order to *overturn* the DAB's conclusion, the statute requires that the PDUSH find not only that diversion was inappropriate but also that any conclusion by the DAB to the contrary" — that is, the DAB's conclusion that the diversion *was* appropriate — "would appear to an ordinary person to be obviously against the weight of the evidence." *Id.* (emphasis added). The court underscored that the VA could meet this burden only by addressing the evidence *supporting* the DAB's many, detailed findings, including, crucially, that "the community standard of care was met for the patient by the decision to redirect the ambulance." *Id.* at 612.

Recognizing the duty of all government officials to adhere to the rule of law, we do not lightly say that, on remand, the DUSH had other ideas, choosing to ignore the Seventh Circuit, just as he had earlier ignored plain language of the statute. But that is what happened. On September 13, 2022, the DUSH, in his second termination letter (the "STL") again reversed the DAB and upheld Dr. Dubnow's termination, forcing yet another round of judicial review.

The STL continues the DUSH's unwarranted, disturbing pattern of intransigence to the law. Congress enacted specific protections for VA doctors like Dr. Dubnow. Astonishingly, the STL did not discuss or even set forth the Seventh Circuit's articulation of Section 7462's "clearly contrary to the evidence standard," much less attempt to show that his decision met that standard. Instead, as with the original December 2018 decision, the STL is premised primarily on the DUSH's conclusion that the FHCC Emergency Department had the minimum pediatric capabilities to treat the patient — that is, that there was no *need* to divert the patient, skipping past whether the diversion was inappropriate or whether the DAB's finding that the diversion *was appropriate* was clearly contrary to the evidence. The DUSH answered the wrong question the first time (twice) and he answered the wrong question the second time (twice). *First,* the DUSH simply failed to pose, much less answer, the

3

question before the DAB based on the articulated charge of misconduct – *i.e.*, whether the decision to divert the patient was appropriate. *Second,* the DUSH failed to grapple with the evidence upon which the DAB relied in order for the DUSH to conclude that it would have been obvious to an ordinary person that the DAB's decision "conflicted with the weight of the evidence." The DUSH did not consider the weight of the evidence; he cherry picked the evidence that he thought supported his answer to the wrong question in the first place (necessity versus impropriety) and then ignored the statute, the law of the case, and the Seventh Circuit's precedential guidance on the second question.

Indeed, even reading into a decision that flaunts the very premise of appellate review that the DUSH through the STL somehow concluded that the diversion was *in*appropriate, the law of this case is that the *DUSH*'s conclusion of impropriety is insufficient to overturn the DAB. It is not "the DAB concluded one thing, but I conclude another" that is sufficient to support a reversal of the DAB. Instead, the Seventh Circuit held — and the parties and the Court are bound by the holding — that the predicate for overturning the DAB is, again, that it would be obvious to an ordinary person that the DAB's decision in Dr. Dubnow's favor conflicted with the weight of the evidence. Again, the STL, like its predecessor, never grappled with the evidence that the DAB itself relied upon to support its conclusion. Incredibly — incredible because this was at the heart of the Seventh Circuit's decision, as Dr. Dubnow made clear in his pre-STL letter to the DUSH — the DUSH *again* failed even to mention (much less rebut) the DAB's determination that Dr. Dubnow's diversion decision met the community standard of care. The slate on which the DUSH wrote was not blank; it was fill-in-the-blanks with virtually nothing left to fill in. The Seventh Circuit gave the DUSH the opportunity on remand to get it right. His decision to ignore the law of the case confirms that he is unwilling to do so.

As we show below, the STL is flatly contrary to the law of this case. As the Seventh Circuit cautioned in *United States v. Sung*, 87 F.3d 194, 196 (7th Cir. 1996): "The decision of a higher court controls whether the lower tribunal agrees or not. Appellate review is not an exercise in persuasion."

4

Nor is appellate review an exercise in patience. Here, Dr. Dubnow was stripped of his reputation and his livelihood despite the fact that the DAB – the expert body mandated by Congress to provide for particularized, specialized administrative appellate review under these precise circumstances — found in his favor and ordered his reinstatement after a full evidentiary hearing. Congress did not vest the VA, through the DUSH, with plenary authority to second guess the DAB and to simply substitute his or her view of a particular set of facts for that of the DAB. Congress instead precisely circumscribed the VA's review. And recognizing that there might be circumstances where the VA would chafe against the very restraints that Congress imposed, Congress provided employees like Dr. Dubnow with two layers of federal court appellate review as of right.

Dr. Dubnow requests that the Court vacate the STL as arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence, and remand with directions to reinstate the DAB's original decision, granting Dr. Dubnow all appropriate relief, including without limitation: (a) reinstatement with full restitution of lost wages and benefits; (b) expungement of the adverse action from his record; (c) withdrawal of the previous report to the National Practitioner Data Bank concerning his termination from federal service; and (d) reimbursement of the reasonable legal expenses incurred in this matter. If the VA had a basis to support its termination decision under the clearly contrary to the evidence standard, we would have seen it. We haven't; and we won't. None exists. It is therefore past time to end this matter, and grant Dr. Dubnow the relief specified above.

## II.    BACKGROUND

### A.    Dr. Dubnow's Pre-Termination Career.[4]

Dr. Dubnow had been practicing emergency medicine since 1979. He was Board Certified in Emergency Medicine and licensed in four states, including Illinois. (AR_0553.) In October 2011, Dr.

---

[4] The key factual background in this case was also recounted by the Seventh Circuit in its decision. *Dubnow v. McDonough*, 30 F.4th 603, 606-608 (7th Cir. 2022).

Dubnow was hired to be the Chief of the Emergency Department at the FHCC. (AR_0105) As a joint VA/DOD facility, the FHCC provides medical services to veterans as well as to active-duty military, primarily those stationed at Naval Station Great Lakes ("NSGL") and their family members.[5] Before his termination, Dr. Dubnow's 40-year medical career was free from discipline, malpractice judgments, or inquiries into his professional competence. He consistently received excellent performance reviews throughout his time at the FHCC. (AR_0101-0104, AR_0109-0119, AR_0124-0135).

**B.** **The April 29, 2017 Incident**

At approximately 2:02 p.m. on April 29, 2017, the FHCC Emergency Department received a telephone call about a seven-month-old infant, who had been found in full cardiorespiratory arrest at base housing located near the NSGL; when the call came in, a Department of Defense ambulance crew was en route. (AR_2197; AR_0282; AR_0550-0553). Typically, incoming ambulance crews with high priority patients establish direct communication with the Emergency Department via two-way radio. (AR_0556-0558.) In this case, however, the call was received on the Emergency Department's general landline telephone, which is ordinarily used only for non-emergency matters. (*Id.*; AR_2189.) The call was placed by the FHCC VA Police Department ("VAPD"), who was patching through the Department of Defense's Great Lakes EMS dispatcher, who, in turn, was relaying information from the ambulance crew to the VAPD dispatcher. (AR_0556-0558; AR_2189.) The atypical manner in which the call came in did not permit direct communication between the FHCC Emergency Department and the ambulance crew. (AR_2189; AR_2198; AR_0557-0558; AR_0572-0576.)

Joseph Carney, an Intermediate Care Technician in FHCC's Emergency Department, received the call and gathered as much information as he could concerning the infant's condition, given the disjointed nature of the call. (AR_0561-0563.) Mr. Carney relayed the information that he was able to

---

[5] *See About the Captain James A. Lovell Federal Health Care Center*, U.S. Dept. of Veterans Affairs, https://www.lovell.fhcc.va.gov/about/index.asp (last visited 11/15/2022).

ascertain to Dr. Dubnow and another physician on duty, Dr. James Martin. (*Id.*) None of Dr. Dubnow, Dr. Martin, or Mr. Carney knew the ambulance's exact location when Mr. Carney received the information, nor could any of them make that determination. (AR_2189.)

Based on the available information, Dr. Dubnow and Dr. Martin concluded that the most likely cause of the infant's cardiorespiratory arrest was trauma, as opposed to sudden infant death syndrome ("SIDS") or some other cause. (AR_2199.) Given this, Dr. Dubnow and Dr. Martin agreed that in their professional medical judgment it was in the best interest of the patient to be transported directly to nearby Lake Forest Hospital. (AR_2189, AR_2200-2203.) To be sure, the FHCC Emergency Department had the basic equipment and minimum level of skill necessary to attempt to resuscitate a pediatric patient, but the staff lacked the experience and specialized training to care for pediatric patients in severe trauma. (AR_2189; AR_2198; AR_2200-2203.) By contrast, Lake Forest Hospital is a State of Illinois designated Level II Trauma Center; it has pediatric hospitalists, pediatric intensivists, and pediatric surgeons on staff; and it is capable of providing excellent pediatric emergency and in-patient care. (*Id.*) *Two minutes* after the call came in (approximately 2:04 p.m.) and based on Dr. Dubnow's and Dr. Martin's exercise of their professional medical judgment, Mr. Carney told the VAPD and DOD EMS dispatchers that the ambulance should proceed directly to Lake Forest Hospital. (AR_2189; AR_2198; AR_0551; AR_0635-0638.)

Nonetheless, seconds after Mr. Carney gave this direction and the call had ended, he noticed on the video monitor that the ambulance had arrived at the FHCC's ambulance bay. (AR_0551; AR_0561-0563.) Mr. Carney informed Dr. Dubnow and the rest of the staff; they immediately prepared to receive the patient and attempt resuscitation. (*Id.*; AR_2189; AR_0551-0552.) The ambulance, however, then left the FHCC ambulance bay and transported the patient to Lake Forest Hospital without further communication with and without presenting the patient to the Emergency Department. (AR_2189; AR_2202; AR_0574-0575.) As noted, The FHCC Emergency Department

7

had no means to communicate directly with the ambulance crew. (*Id.*) Tragically, the patient could not be resuscitated either by the ambulance crew en route or upon arrival at Lake Forest Hospital. (AR_2202).

### C. Dr. Dubnow's Termination

On May 5, 2017, the VA reassigned Dr. Dubnow from his position as Chief of the Emergency Department to a position as a non-supervisory physician with full clinical privileges, while the FHCC investigated the April 29, 2017 incident. (AR_0730.) A VA Administrative Investigative Board ("AIB") was charged with investigating "[a]lleged inappropriate refusal of care or diversion of persons seeking care" from the FHCC Emergency Department. (AR_0306.) The AIB was authorized to "inquire into all aspects of this matter; to require VA employees to cooperate with you; [and] to require all employees having knowledge of the complaint to furnish testimony under oath or affirmation." (*Id.*) Yet, apart from Dr. Dubnow, the AIB interviewed no one who had been on duty in the FHCC ED at the time of the incident -- not Mr. Carney, not Dr. Martin, or not any other key participants or witness to the events of April 29, 2017, and not the ambulance crew that had been involved in the transport and care of the patient. (AR_2191-2194.) The AIB held the diversion contrary to FHCC and VA policies. (AR_0616-0621.)

Relying on the AIB's report, the FHCC's Chief Medical Executive and proposing official for the major adverse action (Dr. Frank Maldonado) recommended that Dr. Dubnow be removed from federal service and that his clinical privileges be revoked. (AR_0649-0652.) Dr. Maldonado supported his proposal with five "charges" – three related to the April 29 incident and two about other events. (*Id.*) Dr. Stephen Holt (the FHCC Director and deciding official) accepted the proposal, terminating Dr. Dubnow's employment effective December 24, 2017. (AR_0835; AR_0838-0840.)

### D. The Disciplinary Appeals Board's Reversal of the Termination

Pursuant to 38 U.S.C. §§ 7461 and 7462, Dr. Dubnow timely appealed the VA's termination

decision. There is no dispute between the parties that Congress provided specific protections for physicians, like Dr. Dubnow, who are terminated in circumstances implicating their professional judgment. Specifically, sections 7461 and 7462 provide that Section 7401(1) employees (a category that includes physicians, like Dr. Dubnow) who are subject to a "major adverse action" that arises out of "a question of professional conduct or competence" have a right to appeal to a Disciplinary Appeals Board ("DAB"). Under Section 7464, the DAB shall consist of three VA employees, each in the same or a superior grade to the employee appealing the adverse action and at least two of whom shall be employed in the same category as the employee who is appealing the adverse action. The DAB, which has *exclusive appellate jurisdiction* over these matters, must provide the employee with an oral hearing, and much like a trial court, is authorized to administer oaths and to receive live testimony. 38 U.S.C. §§ 7462, 7464. At the conclusion of the hearing, the DAB may approve the proposed action; approve it with modification, reduction, or exception; or reverse it. 38 U.S.C. § 7462(c)(2).

Here, consistent with the statute, the VA appointed three senior VA physicians to the DAB. From April 10-12, 2018, it held a three-day hearing on Dr. Dubnow's appeal, including receiving testimony from 13 witnesses. (AR_0857-1734.) After considering the evidence, the DAB on May 25, 2018 issued a 26-page decision, rejecting each of the five charges. (AR_2142-2167.)

Concerning the three April 29, 2017 incident charges, the DAB questioned the thoroughness and impartiality of the AIB's investigation and findings because the AIB did not interview several critical witnesses, including the ambulance crew, Mr. Carney, and Dr. Martin. (AR_2145-2150.) The DAB further found that Dr. Dubnow's decision to divert the ambulance to Lake Forest Hospital was a reasonable exercise of his medical judgment, given the limited information that he had about the patient and the inability of the Emergency Department to communicate directly with the ambulance crew. (AR_2144; AR_2151-2154.) The DAB noted that the FHCC Emergency Department had no experience treating an infant in cardiac arrest, in contrast to the nearby, trauma-certified, Lake Forest

9

Hospital. (*Id.*) The DAB further found that Dr. Dubnow's decision was consistent with the FHCC practice, which gave Emergency Department physicians discretion to divert incoming patients arriving by ambulance to another facility when in their professional judgment that diversion was in the patient's best interest.[6] (AR_2159-2163.) The DAB also noted that once Dr. Dubnow and the FHCC Emergency Department Staff learned that the ambulance had arrived at FHCC, they prepared to receive the patient and begin efforts at resuscitation. (AR_2143; AR_2159.) Yet, the ambulance drove away without further communication. (*Id.*) The DAB concluded that Dr. Dubnow accordingly never refused *to provide care*; the patient was never presented to the FHCC Emergency Department.

The DAB did not brush aside the tragedy of the situation that led it to be constituted. Instead, it specifically noted that clinical judgments falling within the standard of care — here, a diversion decision that was *appropriate under the circumstances* — could sometimes not avoid a bad outcome. The point, though, was that Dr. Dubnow was charged with an inappropriate diversion. He was not charged as being strictly liable for the (likely unavoidable) death of an infant. And the DAB, recognizing the distinction, held that Dr. Dubnow's conduct — in light of the information that he had and the circumstances in which he made his decision — was appropriate, not inappropriate. It met the standard of care. (AR_2153-2154; AR_2158.)

Because the DAB sustained none of the charges, it recommended that Dr. Dubnow be reinstated with full restitution of lost wages and benefits, that his record be expunged of the disciplinary action, that he be fully reimbursed for any and all reasonable expenses incurred to defend himself in the disciplinary proceedings, and that his revocation/reduction in clinical privileges not be reportable to the National Practitioner Data Bank. (AR_2167.)

E. **The DUSH's Remand and Subsequent Reversal on Charge 1**

---

[6] In contrast, FHCC physicians were required to evaluate ambulatory patients, full stop. (AR_2159).

Under 38 U.S.C. § 7462(d), the DAB's decision is subject to review. The DUSH may reverse a DAB's decision only if he finds it to be "clearly contrary to the evidence or unlawful." *Id.*

After receiving the initial DAB ruling, the DUSH remanded the matter to the DAB on Charge 1. Charge 1 states, in full:

> Inappropriate Refusal of Care and/or Diversion. Specification: On or about April 29, 2017, at approximately 2:01 p.m., you inappropriately refused care to and/or diverted a seven-month-old infant in full cardiac arrest en route via ambulance to the FHCC Emergency Department (ED) to Lake Forest Hospital which delayed potentially life-saving treatment. The infant was pronounced dead at 2:46 p.m. at Lake Forest Hospital.

(AR_2197 (underscoring removed for ease of reading).)

The DUSH remanded to the DAB on only a single charge, charge 1 "because the [DAB's] rationale regarding the decision not to sustain the charges is insufficient." (AR_2169.) Specifically, he requested that the DAB "elaborate on its analysis regarding the conclusion that the diversion of the patient was acceptable, focusing on the fact that a fully trained, Board Certified ER physician should have been able to provide care to an infant." (*Id.*) He further stated that the DAB "needs to elaborate on its conclusion that it was acceptable for [Dr. Dubnow] to assume the cardiac arrest was trauma related, and why an assessment of the patient was not warranted before reaching that conclusion." (*Id.*)

On September 11, 2018, the DAB reaffirmed its original decision and amended the Board Action ("Final Board Action") to include additional support for its findings and to address the specific issues raised by the DUSH's remand order. (AR_2188-2216.) In particular, the DAB reiterated that it was reasonable and met the standard of care for Dr. Dubnow to determine that the most likely cause of the infant's arrest was trauma, and therefore the infant would receive better care at a trauma center. (AR_2199; AR_2206). In response, The DAB emphasized the short distance to Lake Forest Hospital and the fact that a fully trained ambulance crew would be expected to be able to provide a secure

11

airway and chest compressions during transport, so that "the time required to travel to Lake Forest Hospital was not a critical factor in determining the outcome of the resuscitation effort." (AR_2191-2192.) Further, the DAB again pointed to the lack of any opportunity for direct contact between the ambulance crew and the Emergency Department, given the necessity of communicating through multiple intermediaries. (AR_2198.) In light of the circumstances, the DAB found that "the limited information" available, specifically, that "the patient was a seven-month infant in cardiac arrest" was sufficient "for Dr. Dubnow to conclude that the FHCC Emergency Department was not the best place for this child to be treated" and that it would be better for the patient to be treated at Lake Forest Hospital, "a center a few minutes away which [Dr. Dubnow] believed superiorly capable to care for a pediatric patient." (*Id.*) The DAB further found that any attempt to elicit additional information from the ambulance crew would only serve to delay efforts "to transport the baby to the best facility as quickly as possible." (AR_2198-2199.)

The DUSH rejected the DAB's amended decision as to Charge 1 ("Inappropriate Refusal of Care and/or Diversion").[7] Parroting the statute (and laboring under a misapprehension that he was correctly applying it), the DUSH concluded that the DAB's finding as to charge 1 was "clearly contrary to the evidence." Despite the DAB's well-supported 29-page opinion, the DUSH supported his decision with a single paragraph of substantive reasoning (as the Seventh Circuit later concluded, not really), stating:

> The [FHCC] not only serves Veterans but also family members housed at the military base. As such, the FHCC is staffed and equipped to handle pediatric cases, and equipment necessary to handle pediatric resuscitation was available. Additionally, you and other staff members on duty that day were Pediatric Advanced Life Support (PALS) certified, and as such, there was no need to divert the ambulance to another facility. The evidence shows that your decision was not justified, and created a serious situation that negatively impacted patient care. […] I find the egregiousness of the conduct as described in Charge 1 justifies the penalty of removal given the

---

[7] The DUSH did not reverse the DAB's findings as to Charges 2, 3, 4 and 5.

circumstances of this case.

(AR_2182-2183) (December 10, 2018 Decision). The DUSH did not set out the factual bases for his conclusion that Dr. Dubnow's conduct was "egregious," did not explain why "no need" proved impropriety (the violation with which Dr. Dubnow was charged) and did not acknowledge that the DAB's decision was entitled to even a wit of deference, much less clearly contrary to the evidence deference (mere disagreement being insufficient for the DUSH to overturn a DAB conclusion).

### F.     The Seventh Circuit's Reversal of the DUSH's December 10, 2018 Decision

Dr. Dubnow sought judicial review from this Court under 38 U.S.C. § 7462(f); the Court affirmed. (AR_2217). Of right, Dr. Dubnow then appealed to the Seventh Circuit, which reviewed the DUSH's decision *de novo*. On appeal, Dr. Dubnow argued that the DUSH's decision was arbitrary and capricious for two reasons. *First*, the DUSH assertedly failed to apply the deferential "clearly contrary to the evidence" standard when reviewing the DAB's decision, required under Section 7462(d)(2)(A). *Second*, the DUSH erred by failing to consider whether Dr. Dubnow's medical judgment to divert the ambulance met the community standard of care. *Dubnow*, 30 F.4th at 609.

The Seventh Circuit vacated the DUSH's final agency action. The court held that the DUSH's reversal of the DAB was "arbitrary and capricious" because the DUSH failed to properly apply Section 7462's deferential "clearly contrary to the evidence" standard when reviewing the DAB's decision to overturn Dr. Dubnow's removal. Acknowledging the task before it — the same one before this Court on the present record — the Seventh Circuit opened its discussion by noting that "the question before us invokes a layered standard of review:  Was the DUSH's decision (that the DAB's decision was clearly contrary to the evidence) arbitrary and capricious or unsupported by substantial evidence?" *Id.* at 609. It further noted that while the first layer of review, under the arbitrary and capricious standard is familiar, "second standard of review layer – the 'clearly contrary to the evidence' – is far less familiar." *Id.* at 610. Indeed, this standard concededly appears nowhere else in the U.S. Code.

13

In an issue of first impression at the appellate level, the Seventh Circuit gave guidance to the VA for the DUSH's review of DAB decisions. It did so by articulating the contours of the "clearly contrary to the evidence" standard of review that Congress created in Section 7462(d). Specifically, relying on the first decision to interpret the provision, the Court held that clearly contrary to the evidence means — and the DAB's decision in Dr. Dubnow's favor must be upheld unless — it "would be obvious to an ordinary person that the DAB's decision conflicted with the weight of the evidence." *Id.* at 610-11 (citing *Savu v. United States*, No. SA-18-CV-00993-JKP-ESC, 2021 WL 1615562, at *2 (W.D. Tex. Apr. 26, 2021)).[8] "Layering these two standards on top of one another," the court held that the DUSH's decision must be set aside "if it did not articulate some rational basis for why the DAB's decision obviously conflicted with the weight of the evidence." *Id.*

The court then applied the law as it had interpreted it. The VA plainly, obviously, unquestionably flunked:

> In his four-sentence description of his findings, the PDUSH's conclusion appears to rest on his finding that "there was no need to divert the ambulance to another facility." But whether there was a need to divert the ambulance is not at all the question the PDUSH, or even the DAB, was required to answer. The relevant question **for the DAB** was whether the diversion was appropriate; if so, Dubnow's removal could not be sustained. But to conclude, as the PDUSH did, that treating the patient at the hospital was possible, or even appropriate, is not to conclude that diverting the ambulance to a better-equipped hospital would have been *in*appropriate. And, moreover, **this is not the question the *PDUSH* was tasked with answering**. Rather, the PDUSH was tasked with deciding whether the **DAB's conclusion on that question** was clearly contrary to the evidence. As such, the PDUSH's conclusion that there was "no need" to divert the patient is **two steps removed** from the analysis Congress tasked him with performing under 38 U.S.C. § 7462(d).
>
> More generally, even if we could conclude that the PDUSH found that diversion was inappropriate, the PDUSH appears to have substituted his judgment for the DAB's, in explicit violation of the statute. In fact, the VA itself says as much, writing in its brief, "The charge was that Dubnow's diversion of the ambulance was inappropriate; the Board found that it was not, and the PDUSH found that it was." But, again, this

---

[8] *Savu* was not available when the VA issued its initial December 2018 decision or when this Court initially affirmed. Indeed, the Seventh Circuit noted that, at the time of its ruling, *Savu* was the only court to have decided the issue, finding its decision "well-reasoned." 30 F. 4th at 610-11.

is insufficient for the PDUSH to overturn the DAB's conclusion. In order to overturn the DAB's conclusion, the statute requires that the PDUSH find not only that diversion was inappropriate but also that any conclusion by the DAB to the contrary would appear to the ordinary person to be obviously against the weight of the evidence. **Because it is entirely devoid of a discussion of the DAB's numerous, detailed findings, the PDUSH's opinion contains no rational basis for such a sweeping conclusion.**

*Id.* at 611 (italics in original; bold added).

The Seventh Circuit accordingly vacated the DUSH's decision overturning the DAB and remanded the matter for reconsideration under the proper legal standard — the law of this case. *Creek v. Vill. of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998) ("most elementary application" of the law of the case doctrine is that "when a court of appeals has reversed a final judgment and remanded the case, the district court is required to comply with the express or implied rulings of the appellate court").[9]

**G.       The DUSH Ignores the Seventh Circuit, Reversing the DAB a Second Time.**

Following the Seventh Circuit's decision, Dr. Dubnow urged the DUSH, in writing, to reinstate the DAB's decision. (AR_2245-2300.) He did not do so in conclusory fashion. He instead gave the VA a roadmap, pairing the Seventh Circuit's articulation of what the clearly contrary to the evidence standard requires with the evidence that the DAB itself relied upon in directing his reinstatement. (*Id.*)

The VA paid no heed. On September 13, 2022, Dr. Dubnow received a copy of the DUSH's Decision on remand (dated September 6, 2022). (AR_2301-2304.) The DUSH again reversed the DAB's decision in Dr. Dubnow's favor. That decision, the STL, constitutes the final administrative action in the case and is the current subject of review.

---

[9] The VA did not seek panel *en banc* rehearing, nor did it seek Supreme Court review. The Seventh Circuit's mandate issued on May 24, 2022. Accordingly, while the VA has at no time sought a *different* interpretation of the clearly contrary to the evidence standard than the one articulated by *Sava* and adopted by the Seventh Circuit, the ship has sailed on the VA taking that position in this case. Here, the law of the case is completely settled in respect to what the standard requires. As discussed below, the VA never acknowledged the Seventh Circuit's interpretation of the standard, much less tried to meet it.

Although the STL's substantive discussion is slightly longer than the original decision (one-and-a-half pages versus one paragraph), the STL retains the original decision's facially flawed rationale. The STL focuses primarily on the undisputed point that the "FHCC ER had pediatric capabilities," and thus, according to the DUSH, there was no *need* to divert the patient to another facility. (AR_2304.) The STL cites some evidence supporting the VA's position of lack of need, while ignoring the DAB's detailed findings and conclusions concerning propriety. This happened even though the Seventh Circuit directed the VA not to act this way. Dr. Dubnow timely filed his complaint with this Court and now urges reversal.

### III.   ARGUMENT

As set forth above, the Seventh Circuit articulated the standard for this Court's review of the DUSH's decision. That articulation is doubly controlling here: it is a superior court's interpretation of a federal statute and it is the law of this case. The standard is whether "it would be obvious to an ordinary person that the DAB's decision conflicted with the weight of the evidence." *Dubnow*, 30 F.4th at 610-611. This Court must "vacate the PDUSH's decision if it did not articulate some rational basis for why the DAB's decision obviously conflicted with the weight of the evidence." *Id.* at 611. On remand from the Seventh Circuit, the DUSH yet again failed to meet the controlling standard. Remarkably, the STL is devoid of any discussion of the standard and evidences no attempt to meet it. The STL must therefore be reversed as both "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law" under 38 U.S.C. § 7462(f)(2)(A), and "unsupported by substantial evidence" pursuant to § 7462(f)(2)(C). And here, because the VA has shown that it has absolutely no intention of following the law on its own, the Court should specifically direct that Dr. Dubnow be reinstated. The VA is not entitled to a third try for a foregone conclusion.

### A.   The DUSH Failed to Apply the "Clearly Contrary to the Evidence Standard."

The Seventh Circuit held that that the DUSH's previous "conclusion that there was 'no need'

16

to divert the patient is two steps removed from the analysis Congress tasked him with performing under 38 U.S.C. § 7462(d)." *Dubnow*, 30 F.4th at 611. Yet despite this clear mandate, the DUSH has doubled down, again basing his decision on the undisputed fact that the "FHCC ER had pediatric capabilities" and that "despite these pediatric capabilities, you instructed staff to divert an infant in full cardiac arrest." (AR_2304). Thus, the DUSH again focused on the wrong question (whether there was a need to divert the ambulance), as opposed to conducting the two-step inquiry required by Congress – whether the diversion decision was inappropriate and whether the *DAB's* determination that the decision was appropriate was clearly contrary to the evidence.

To be clear, Dr. Dubnow has never disputed that the FHCC Emergency Department had the minimum capability to treat an infant in cardiorespiratory arrest. Rather, he argued to the DAB and the DAB agreed – based on a detailed consideration of the record evidence as a whole – that *despite* the FHCC having those minimum capabilities, Dr. Dubnow's decision to divert the patient to a nearby facility where he could receive better care was reasonable and within the community standard of care and accordingly was not inappropriate. (AR_2189; AR_2197-2201.) In reaching that decision, the DAB considered and discussed the following key pieces of record evidence:

- Due to the extremely unusual way in which the ambulance crew contacted the FHCC Emergency Department and the inability of the FHCC ED to communicate directly with the ambulance crew, Dr. Dubnow had extremely limited information about the patient and did not know where the ambulance was relative to the FHCC at the time of the call. (AR_2189, AR_2198.)

- Although the FHCC Emergency Department had the minimum capability (in terms of training and equipment) to assist a pediatric patient in cardiorespiratory arrest, the equipment and staff "were not battle tested." (AR_2201.) In fact, during the last five to six years, there had *never* been a pediatric case brought by ambulance that required advanced life support of any kind. (*Id.*; AR_0555.) Thus, while the Emergency Department staff had some training in pediatric advanced life support, they had no practical real-life experience managing an infant in cardiorespiratory arrest. (*Id.*)

- No pediatric staff were available at the FHCC to assist with the treatment of the patient, nor to manage the patient afterwards if resuscitative efforts were successful, when the patient's condition would still be precarious. (AR_2201.)

17

- In the professional judgment of both Dr. Dubnow and his colleague Dr. James Martin, the other ED physician on duty at the time, the likely cause for the infant's cardiorespiratory arrest was trauma as opposed to SIDS, and therefore they made the medical judgment that the patient would receive better care at a trauma center. (AR_2198-2200.)

- While the DAB heard evidence from Dr. Dubnow and Dr. Martin that "the most likely etiology for this infant arrest was trauma," the VA "made no attempt to challenge the validity of this assumption" and further Dr. Maldonado (who made the termination recommendation) "did *not* base his recommendation for removal on whether Dr. Dubnow's assumption of the likely etiology was incorrect." (AR_2199.)

- Lake Forest Hospital, a certified Level II Trauma Center, was only a few miles away with advanced capabilities to care for pediatric patients, both during the initial resuscitative efforts and thereafter. (AR_2189; AR_2191.) Moreover, "a fully trained EMS crew would be expected to have a secure airway and provide effective chest compressions during transport." (AR_2191.)

- Dr. Dubnow's decision to divert the ambulance on April 29, 2017 was consistent with the FHCC Emergency Department's "established and long-standing practice of diverting ambulance[s] to a more appropriate facility." (AR_2207.) Indeed, FHCC ED physicians "had practiced case-by-case ambulance diversion over a substantial time frame with the full knowledge and approval of top leadership. (AR_2208.)

- After giving the diversion order, FHCC staff learned that the ambulance had already arrived at the FHCC ambulance bay. (AR_2189; AR_2204.) At this point, Dr. Dubnow and the staff prepared to receive the patient and begin resuscitative efforts. (*Id.*) The ambulance, however, pulled away without further communication, and the Emergency Department had no ability to contact the ambulance directly. (*Id.*)

This evidence overwhelmingly supports the DAB's conclusion that the diversion decision was appropriate and aligned with the community standard of care. The STL fails to show why the mere fact that the FHCC could have treated the patient means that it is "obvious to an ordinary person that the DAB's decision conflicted with the weight of the evidence." *Dubnow*, 30 F.4th at 610-611. Clearly, in light of the record evidence, it would be impossible for the DUSH to ever meet the standard.

### B.    The DAB's Decision Did Not Conflict With the Weight of the Evidence.

Similarly, like the one preceding it, the STL must be reversed because it "is entirely devoid of a discussion of the DAB's numerous, detailed findings" and thus "contains no rational basis" for a reviewing court to conclude that the DAB's Decision was clearly contrary to the evidence. *Dubnow*, 30

18

F.4th at 610-611. Although the DUSH set forth the evidence supporting his view in greater detail than in his original decision, he again failed to discuss the extensive evidence cited by the DAB in its 29-page amended opinion. The DUSH's failure to even address the grounds relied on by the DAB for its decision falls well short of demonstrating that an ordinary person would regard the DAB's decision that the diversion was appropriate to be obviously against the weight of evidence.

For example, the DUSH does not discuss nor account for the fact that Dr. Dubnow had very limited information available to him when he made his split-second decision, given the lack of normal communications with the ambulance – a key element of the DAB's ruling. (AR_2189.) The DUSH states that the "FHCC was the closest medical facility." (AR_2304.) But that fails to account for the fact that the record is crystal clear that Dr. Dubnow had no way of knowing precisely where the ambulance was when he made the call to divert it. (AR_2189; AR_2198.) The DUSH does not discuss or account for the relative strengths and weaknesses of the capabilities of the FHCC versus Lake Forest Hospital, weighed against the time it would take for the ambulance to travel to either facility – a subject that the DAB analyzed. (AR_2201-2202.) The STL does not include a discussion of the reasonableness of Dr. Dubnow's and Dr. Martin's professional judgment that the likely cause for the infant's cardiorespiratory arrest was trauma as opposed to SIDS, and therefore that the patient would receive better care at a trauma center; a subject considered by the DAB. (AR_2199; AR_2207.) These are but a few examples of the DUSH's continued failure to "grapple *at all* with any of the reasons the DAB advanced for overturning the charge against Dubnow." *Dubnow*, 30 F.4th at 612.

True, the DUSH need not "mention or analyze every piece of evidence in the record." *Dubnow*, 30 F.4th at 612. But the total failure of the DUSH – yet again – to meaningfully analyze and consider the DAB's findings and the overall weight of the evidence renders the DUSH's decision arbitrary and capricious. As the Seventh Circuit explained:

But when Congress explicitly directs that a DAB's decision may only be reversed upon

19

> a finding that it was clearly contrary to the evidence, any such reversal should contain some analysis constructing a "logical bridge" between the evidence and the conclusion that the DAB's finding was obviously against the weight of that evidence. Merely listing a few reasons that support the conclusion opposite the DAB's, without any discussion of the evidence relied on by the DAB, is not enough to meet this minimal bar.

*Id.* at 612 (cleaned up).

This time, the DUSH attempted to support his decision by claiming that there was "no evidence" that the cause of the infant's cardiac arrest was "trauma or severe trauma," and thus Dr. Dubnow had no basis to believe the infant would fare better at nearby Lake Forest Hospital's trauma center. (AR_2304.) But contrary to the DUSH's assertion, the DAB heard evidence on this very point. Indeed, in 2018, the DUSH ordered the DAB to "elaborate on its conclusion that it was acceptable for [Dr. Dubnow] to assume the cardiac arrest was trauma related." (AR_2169.) The DAB did just that, considering testimony from both Dr. Dubnow and Dr. Martin about why they believed the most likely cause of the cardiac arrest was trauma as opposed to some other cause. (AR_2199) (citing testimony). The DAB noted that the VA "made no attempt to challenge the validity of this assumption," and thus Dr. Dubnow's decision that the cardiac arrest was likely trauma-related "cannot be used to support the adverse action." (AR_2199.)

Specifically, Dr. Dubnow knew that the patient was a seven-month-old infant. Unlike 65-year-old men, babies' hearts do not typically stop beating due to heart attacks. Instead, both Dr. Dubnow and Dr. Martin zeroed in on trauma and SIDS as the most likely causes. Dr. Dubnow testified that "statistically SIDS occurred at night," and in infants younger than six months. (AR_1017). "Traumas happen during the day." (*Id.*). This was around 2 p.m., and in a seven-month-old. Thus, he concluded "it was a high probability this was an arrest as a result of a trauma of some sort." (*Id.*). Dr. Martin testified similarly, "I'm thinking trauma because it's daylight. In my experience it's kids in daylight that get into trouble with trauma." (AR_1624; *see also* AR_1626; AR_1641-42). It was precisely this

evidence and this medical judgment that the DAB credited.

The DUSH cites testimony from a Dr. Callahan who said "most infant cardiac arrests are respiratory in nature." (AR_2303; AR_1184). But Dr. Callahan did not testify that Dr. Dubnow's judgment that this patient's cardiac arrest was likely trauma related failed to meet a standard of care. And even if Dr. Callahan had so testified, merely identifying a conflict among witnesses is a far cry from meeting the applicable standard – that "it would be obvious to an ordinary person that the DAB's decision conflicted with the weight of the evidence." *Dubnow*, 30 F.4th at 610-611.

### C. The DUSH Failed to Evaluate Dr. Dubnow's Conduct Against the Community Standard of Care.

Finally, just like last time, the DUSH's failure to identify a relevant standard of care and hold Dr. Dubnow's conduct up to it is strong evidence that the DUSH "lacked a rational basis for his decision." *Dubnow*, 30 F.4th at 612. The conduct of professionals like lawyers, doctors, accountants, and others is not judged based on outcomes, like whether a case was lost or a patient died. As the DAB said, "Good and proper medical decisions sometimes end with bad results." (AR_2202.) Rather, a doctor's performance is evaluated against a "community standard of care." The Seventh Circuit was impressed by the DAB's conclusion that "'the community standard of care was met for the patient by the decision to redirect the ambulance,'" noting that "this conclusion appears to have played a predominant role in the DAB's ultimate conclusion that Dubnow's actions were not inappropriate." *Dubnow*, 30 F.4th at 612. It further held:

> Because the PDUSH was tasked with evaluating whether the DAB's findings were clearly contrary to the evidence, one would expect to see some discussion in the PDUSH's opinion of the DAB's rather significant conclusion on this point. The total absence of any such discussion suggests that the PDUSH misunderstood his role as a deferential reviewer of the DAB's findings.

The first time around, the DUSH may have misunderstood his role as a deferential reviewer of the DAB. Not so the second time. Yet, the words "standard of care" still do not appear in the STL at all. The failure to discuss the DAB's conclusion regarding the community standard of care is more

21

than telling. The STL simply cannot stand under the statute and the law of this case.

### IV.    CONCLUSION

The Seventh Circuit's mandate in this case was not merely a suggestion, but instead constitutes binding precedent the DUSH was required to follow. *See Sung*, 87 F.3d at196.[10] The DUSH's failure to do so underscores that this Court should not only vacate the STL, but that it should remand the case to the VA with express instructions that the DAB's original decision in Dr. Dubnow's favor be affirmed and reinstated.

For the foregoing reasons, Plaintiff Jeffrey Dubnow, M.D., respectfully requests that the Court grant Dr. Dubnow the relief requested in the Complaint. Specifically, Dr. Dubnow requests that the Court vacate the STL as arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence, and remand with directions to reinstate the DAB's original decision, granting Dr. Dubnow all appropriate relief, including without limitation:  (a) reinstatement with full restitution of lost wages and benefits; (b) expungement of the adverse action from his record; (c) withdrawal of the previous report to the National Practitioner Data Bank concerning his termination from federal service; and (d) reimbursement of the reasonable legal expenses incurred in this matter.

Respectfully Submitted,

By: /s/ *Alan Nicgorski*
Alan Nicgorski
HANSEN REYNOLDS LLC
150 S. Wacker Dr., 24th Fl.
Chicago, IL 60606
(312) 265-2252
anicgorski@hansenreynolds.com
*One of his attorneys*

---

[10] In *Sung*, the Seventh Circuit vacated a sentence imposed by the district court because it had not applied the correct legal standard under the U.S. Sentencing Guidelines. Further, the Seventh Circuit provided express guidelines on how the issue should be addressed on remand. Yet, the district court simply ignored the Seventh Circuit's opinion and imposed the same sentence. The DUSH's decision on remand here is of a similar vein, and therefore must be vacated again – this time with express instructions to affirm the DAB's well-supported decision in Dr. Dubnow's favor.