IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY DUBNOW, | ) | |
| | ) | |
| Plaintiff, | ) | No. 22 C 5580 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| DENIS MCDONOUGH, Secretary of Veterans Affairs, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Jeffrey Dubnow, brings this suit against Denis McDonough, Secretary of Veterans Affairs, seeking judicial review of the final administrative decision to terminate plaintiff's employment as a physician at the Captain James A. Lovell Federal Health Care Center ("FHCC"). This is the second such suit plaintiff has filed, the previous suit having ended with the United States Court of Appeals for the Seventh Circuit vacating the decision to terminate plaintiff and remanding to the Department of Veterans Affairs ("VA") for further proceedings. On remand, the VA made the same decision again, sustaining the charges against plaintiff and upholding his termination. Plaintiff filed this suit, asserting that the VA did not correctly apply the legal standard described in the Seventh Circuit's decision. For the following reasons, the Court agrees with plaintiff, and it remands this case to the VA for further proceedings.

**I. Background**

The facts of this case and the basic procedural background have already been described in two judicial opinions. *See Dubnow v. McDonough*, 30 F.4th 603, 606-08 (7th Cir. 2022) (reversing

and remanding *Dubnow v. Wilkie*, No. 19 C 2423, 2020 WL 6681345, at *1-2 (N.D. Ill. Nov. 12, 2020)). The Court will attempt to be brief in setting the stage for a third time.

    A.    **Factual Background**

At the time of the events that are the subject of this case, plaintiff was the Chief of the Emergency Department ("ED") at the FHCC in North Chicago, Illinois, a role he took on in October 2011. The FHCC, the product of a partnership between the VA and the Department of Defense, provides integrated health care services to veterans and active-duty servicemembers and their families.

At approximately 2:00 PM on April 29, 2017, the FHCC ED received a call from the VA Police Dispatch. The dispatcher stated that an ambulance was en route to the FHCC from nearby military base housing with a seven-month-old infant in full cardiorespiratory arrest.

Informed of this call, but with no way to communicate directly with anyone in the ambulance, plaintiff conferred with another physician on duty, Dr. James Martin, and decided to direct the ambulance to Lake Forest Hospital, approximately six miles away from the FHCC. He reasoned that a likely cause of the infant's condition was trauma, and Lake Forest Hospital was a Level II trauma center staffed with pediatric specialists. Although the staff of the FHCC ED were trained and equipped to provide pediatric life support, they were inexperienced in such cases, and plaintiff judged that the patient was likely better off at Lake Forest Hospital.

An FHCC ED technician attempted to relay plaintiff's directions to the ambulance crew, but as soon as the call ended, he noticed that a security monitor showed that the ambulance had already arrived at the FHCC's ambulance bay. Plaintiff and the ED staff prepared to receive and treat the patient, but then, apparently, the ambulance crew belatedly received plaintiff's relayed

instructions, and the ambulance immediately departed for Lake Forest Hospital. The ED staff had no way to re-initiate communications with the ambulance crew. The patient could not be resuscitated, either en route or at the hospital, and the child was pronounced dead at 2:46 PM.

### B. Plaintiff's Termination and Administrative Appeal

The VA initiated an investigation of the incident by an Administrative Investigation Board ("AIB"). Following the investigation, Dr. Stephen Holt, Director of the FHCC, terminated plaintiff for, among other reasons not relevant here, inappropriately refusing care and/or diverting the seven-month-old patient to another hospital.

Under 38 U.S.C. § 7461(b)(1), plaintiff appealed his removal to a Departmental Appeals Board ("DAB"), which consisted of three senior VA physicians, appointed by the VA's Deputy Under Secretary For Health for Operations and Management to consider the appeal, *see* 38 U.S.C. § 7464(a). After hearing testimony from thirteen witnesses over three days, the DAB issued a lengthy report on May 25, 2018, in which it explained that the evidence did not support the charges against plaintiff and recommended overturning plaintiff's removal. The DAB set forth numerous reasons for its conclusion, including the following: Lake Forest Hospital was nearby; the ambulance crew was capable of providing the care necessary to resuscitate the infant, if possible, during transport; the AIB's investigation had suspicious and significant holes, as the investigators had not spoken with numerous key witnesses to the events of April 29, 2017, including certain members of the ED staff and the ambulance crew; plaintiff had only limited information about the patient's condition and, without direct contact with the ambulance crew, was limited in his ability to obtain further details; plaintiff's intent was to see that the infant was transported to the best facility as quickly as possible; the decision to divert the ambulance met the community standard

3

of care; and, although the FHCC had staff who were equipped and trained to treat the patient, none of them were "battle-tested" in such matters (May 25, 2018 DAB Report at 10, Certified Administrative Record ("AR") at 2152, ECF No. 12-6 at 17), as there had been no pediatric cases requiring advanced life support of any kind in the six years plaintiff had worked there.

The DAB sent its findings to the office of the VA's Deputy Under Secretary of Health ("DUSH"),[1] the official responsible for reviewing the DAB's report and making a final decision, 38 U.S.C. § 7462(d)(4), as to whether to execute the DAB's decision by reinstating plaintiff's employment or to reverse the DAB's decision and sustain the charges. In July 2018, the DUSH remanded the case to the DAB for further explanation of its decision, stating that the DAB's "rationale [for] its decision not to sustain the charges [was] insufficient" and the DAB should explain why "diversion of the patient was acceptable, focusing on the fact that a fully trained, Board Certified ER physician should have been able to provide care to an infant," and why it was "acceptable for [plaintiff] to assume the cardiac arrest was trauma related" without any hands-on assessment of the child. (Jul. 31, 2018 Mem., AR at 2169, ECF No. 12-6 at 35.)

The DAB provided additional explanation in an amended opinion, in which it did not alter its conclusion that none of the charges against plaintiff should be sustained. The DAB explained that its decision was based essentially on its finding that, while plaintiff knew that he could "manage a pediatric code," he had appropriately reasoned that the FHCC was "not the best place for this code to be conducted" because the "capabilities of [Lake Forest Hospital] far exceed the

---

[1] The opinions in plaintiff's earlier case refer to this official as the "Principal Deputy Under Secretary of Health" ("PDUSH"), but the agency has explained on remand and in this case that now the correct nomenclature is simply "Deputy Under Secretary for Health." (Compl., Ex. B at 1, ECF No. 1; Def.'s Resp. at 2, ECF No. 14.)

capabilities at FHCC" in several important respects. (Am. DAB Report at 13, AR at 2201, ECF No. 12-7 at 15.) In particular, plaintiff was appropriately focused on the fact that Lake Forest Hospital was better placed to "manage the child if the resuscitative efforts were successful" because the FHCC, unlike Lake Forest Hospital, lacked staff who were experienced in caring for patients such as this seven-month-old infant. (*Id.* at 12, AR at 2200, ECF No. 12-7 at 14.) The DAB stated that the "importance of that . . . deficiency cannot be overstated" because, even if plaintiff had received the patient, and even if efforts to resuscitate the patient had succeeded, he would have still had to find a hospital with a pediatric intensive care unit while managing the patient's condition without the support of a "pediatric intensivist or even a pediatrician," which would be a "deviation from the community standard of care." (*Id.* at 12, AR at 2200, ECF No. 12-7 at 14.)

Importantly, the DAB explained, this critical concern was not outweighed by the distance of the patient from Lake Forest Hospital for two reasons. First, the DAB explained that the ambulance crew itself was capable of performing the critical first step in treating the patient: opening a secure airway. (*Id.* at 3, AR at 2191, ECF No. 12-7 at 5 (internal quotation marks omitted).) (If the crew had any problems with that issue, it does not appear in the record; the DAB noted with dismay that the ambulance crew, as well as many other important witnesses, had not been interviewed during the initial investigation.) Second, the DAB emphasized that the distance between FHCC and Lake Forest Hospital was short: the DAB was able to make the trip in less than ten minutes at the height of weekday rush hour, and, of course, an ambulance with lights and sirens would have been able to make the same trip in a much shorter time.

The lack of direct communication with the ambulance crew at the time of the incident left plaintiff with limited information to go on. Dr. Holt and other witnesses faulted plaintiff for not attempting to establish communication with the ambulance, but the DAB concluded that, while some physicians might have done so, plaintiff's decision was not a deviation from the standard of appropriate medical care because, for the above reasons, "there was no information that could be provided [by the ambulance crew] that would change the dynamics of which of the two hospitals was the best location for the child to be brought to." (*Id.* at 10, AR at 2198, ECF No. 12-7 at 12.)

For these reasons, the DAB concluded that plaintiff had appropriately decided to divert the patient because what was most critical was not getting the patient to a hospital for resuscitation as quickly as possible, given that the ambulance crew could handle the initial resuscitative efforts; it was getting the patient to the best place for the care the infant would need if those initial resuscitative efforts succeeded. Therefore, according to the DAB, the decision to redirect the patient met the community standard of care. (*Id.* at 13-14, AR at 2201-02, ECF No. 12-7 at 15-16.) It followed that the DAB could not sustain the charges against plaintiff, and the DAB concluded that plaintiff's employment should be reinstated. (*Id.* at 26-27, AR at 2214-15, ECF No. 12-7 at 28-29.)

In a brief decision of only a little more than a page, the DUSH reversed the DAB's decision on Charge One, the charge of inappropriately refusing and/or diverting care. The DUSH's reasoning, in its entirety, was as follows:

> The [FHCC] not only serves Veterans but also family members housed at the military base. As such, the FHCC is staffed and equipped to handle pediatric cases, and equipment necessary to handle a pediatric resuscitation was available. Additionally, [plaintiff] and other staff members on duty that day were Pediatric Advanced Life Support (PALS) certified, and as such, there was no need to divert the ambulance to another facility. The evidence shows [plaintiff's] decision to

6

> divert the ambulance was not justified, and created a serious situation that negatively impacted patient care . . . . I find the egregiousness of the conduct as described in Charge One justifies the penalty of removal given the circumstances of this case.

(Dec. 10, 2018 Letter, AR at 2182-83, ECF No. 12-6 at 51.)

### C. Judicial Review in Case No. 19 C 2423 and Appeal

Plaintiff filed a complaint in this district in April 2019, seeking judicial review of the DUSH's decision under 38 U.S.C. § 7642(f)(2); *see* 38 U.S.C. § 7462(d)(4). The district judge affirmed the VA's removal of plaintiff from federal service, reasoning that the DUSH's decision was not arbitrary and capricious. Plaintiff filed a notice of appeal.

The Seventh Circuit reversed the district court's decision, vacated the VA's decision, and remanded the action to the VA for further proceedings. The appellate court explained that the governing statutes require courts to apply a "layered" standard of review to decisions such as the DUSH's because, while courts must treat the DUSH's decision with deference, the DUSH is also required to treat the DAB's decision with deference. *Dubnow*, 30 F.4th at 609. The DUSH's review is governed by 38 U.S.C. § 7462(d)(2), which provides that the Secretary of Veterans Affairs (represented, for purposes of this case, by the DUSH)[2] may reverse or vacate a decision of a DAB if it finds the decision to be "clearly contrary to the evidence or unlawful." Upon judicial review, a court must reverse the decision of the DUSH if it finds the decision to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule, or regulation having been followed; or (C) unsupported by

---

[2] The Under Secretary for Health is responsible for the operation of the Veterans Health Administration. 38 U.S.C. § 305. Departmental regulations delegate to the DUSH the Under Secretary of Health's responsibility to execute decisions of DABs regarding removal of VA-employed physicians from federal service. VA Handbook 5021 Part V, Ch. 1 § 9(e).

substantial evidence." 38 U.S.C. § 7462(e)(2). The upshot is that the question courts must ask in reviewing a decision of the DUSH to reverse a decision of a DAB, in circumstances where there is no procedural challenge, is the following: "Was the [DUSH'S] decision (that the DAB's decision was clearly contrary to the evidence) arbitrary and capricious or unsupported by substantial evidence?" *Dubnow*, 30 F.4th at 609.

The court explained that a decision is arbitrary and capricious or unsupported by substantial evidence if it "lacks a rational basis," or if the agency "failed to articulate a satisfactory connection between the facts found and the choice made," such that there is no "logical bridge between the evidence and its conclusion." *Id.* at 610 (internal quotation marks omitted). And the decision is "clearly contrary to the evidence" if "it would be obvious to an ordinary person that the DAB's decision conflicted with the weight of the evidence." *Id.* Therefore, "[l]ayering these two standards on top of one another," a court is required to vacate a decision of the DUSH "if it did not articulate some rational basis for why the DAB's decision obviously conflicted with the weight of the evidence." *Id.*

Applying this layered standard to the facts of the case, the Seventh Circuit explained that the DUSH's decision did not meet the requisite standard because it appeared to rest on the DUSH's finding that there was no need to divert the ambulance to another facility. But whether there was any "need" to divert the ambulance was irrelevant; the DUSH's task was to consider whether the DAB's conclusion—that diverting the ambulance to a better-equipped hospital was appropriate—was clearly contrary to the evidence.

Not only did the DUSH address the wrong question by considering whether the diversion was necessary rather than whether it was appropriate, he also improperly "substituted his judgment

8

for the DAB's, in explicit violation of the statute." *Id.* at 611. To reverse the DAB, "the statute require[d] the [DUSH] [to] find not only that diversion was inappropriate but also that any conclusion by the DAB to the contrary would appear to the ordinary person to be obviously against the weight of the evidence." *Id.* But the DUSH's decision lacked any "discussion of the DAB's numerous, detailed findings," so it "contain[ed] no rational basis for such a sweeping conclusion." *Id.*

Therefore, the Seventh Circuit explained, the DUSH "failed to grapple *at all* with any of the reasons the DAB advanced for overturning the charge." *Id.* at 612. While he was not required to "mention or analyze every piece of evidence in the record," his decision was required to "contain some analysis constructing a 'logical bridge' between the evidence and the conclusion that the DAB's finding was obviously against the weight of that evidence." *Id.* (quoting *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012)). "Merely listing a few reasons that support the conclusion opposite the DAB's, without any discussion of the evidence relied on by the DAB, is not enough to meet this minimal bar." *Id.* at 612.

### D. DUSH's Decision On Remand

On remand, the DUSH again reversed the DAB and sustained plaintiff's removal from federal service. The Court reproduces below the decision's "Analysis" section in full, omitting only the internal record citations:

> With respect to Charge 1, Specification 1, the evidence reflects that on April 29, 2017, you instructed James Carney, Intermediate Health Care Technician, FHCC, to divert a pediatric patient to another medical facility because FHCC did not have "pediatric capabilities." However, the evidence clearly reflects that FHCC possessed pediatric capabilities in terms of both equipment and staff. Furthermore, the former FHCC Emergency Room staff were trained in Basic Life Support (BLS) as well as Pediatric Life Support (PALS) and all physicians were board certified.

9

FHCC was equipped with a pediatric crash cart, a pediatric GlideScope, and defibrillators.

In addition, Dr. Maldonado, Chief Medical Executive, FHCC, testified that generally diversion occurs in the following scenarios: (1) "an ST elevation" (a finding on an electrocardiogram where in the trace in the ST is abnormally high); (2) severe trauma[,] "especially head trauma"; (3) burns; and (4) obstetric cases "where the patient is in labor." However, there is no evidence that any of these scenarios applied in this case. The only information provided to you was that a seven-month-old was experiencing cardiac arrest. Additional information e.g., blood pressure, heart rate, or other information regarding potential trauma was neither received nor requested by staff or you. In deciding not to sustain this charge, the Board relied on the testimony of Dr. James Martin, ER Physician and Union Representative. Specifically, Dr. Martin testified, "In this particular case, given the information that I had, the best place was a trauma center[.]" This opinion was confirmed even with the knowledge that the scene of the arrest was Base Housing. However, Dr. Martin also testified that he was uncertain about the infant's underlying condition as he "didn't have enough information." Dr. Martin's latter testimony creates ambiguity as to how he concluded the "best place" was a trauma center if he was uncertain that trauma had actually occurred. Similar to the testimony of the FHCC Nurse Manager, Ms. Barassi-Jackson, Dr. Martin testified that had the infant arrived, the ER team could have begun treatment.

Moreover, Dr. Edward Callahan, who served as the Chief of Milwaukee VA and the VISN Lead for VISN 12 Emergency Medicine, testified that most infant cardiac arrests are "respiratory in nature" and thus, "obtaining airway, oxygen management airway [*sic*]³ is the most critical thing." Dr. Callahan also testified that every minute that passes where an infant is not breathing, impacts survival; therefore, "any facility that's closest would be the most appropriate to manage that." Dr. Callahan also testified that the Administrative Investigation Board, concluded that your actions were "taken in violation of the VHA emergency medical directive. Specifically, around the acceptance of critically ill or cardiac patients."

It is well established that the Agency's burden of proof in these matters is preponderant evidence. The agency is not required to prove every aspect of a specification. Rather, the agency is only required to "prove so much of the specification as is necessary to support the essence of the charge." *Hicks v. Department of Treasury*, 62 MSPR 71, 74 (1994). Here, the evidence reflects that: (1) FHCC ER had pediatric capabilities; (2) despite these pediatric capabilities, you instructed staff to divert an infant in full cardiac arrest; (3) FHCC was the closest

---

³ Of course, what Dr. Callahan said is that "oxygen airway management is the most critical thing" (Callahan Tr. at 327:24, AR at 1184, ECF No. 12-2 at 329), but the DUSH transposed the words "airway" and "management."

10

> medical facility; and (4) at the time of the diversion there was no evidence of trauma or severe trauma. Therefore, the Board's conclusion that the Agency did not meet its burden of proof with respect to this Charge is clearly contrary to the evidence.

(Sep. 6, 2022 Letter, AR at 2302-04, ECF No. 12-7 at 120-22.) Soon afterward, plaintiff filed this action, seeking judicial review of the DUSH's decision on remand.

II. **Analysis**

As the Seventh Circuit explained, the DUSH is required to "articulate some rational basis for why the DAB's decision obviously conflicted with the weight of the evidence." *Dubnow*, 30 F.4th at 610. The appellate court vacated the DUSH's 2018 decision because it "failed to grapple" with the DAB's reasons for overturning the charge. *Id.* at 612. Bewilderingly, the DUSH has made the same mistake again. This case has come before the DUSH three times—first, to review the DAB's May 2018 decision, then to review the DAB's September 2018 amended decision, and then on remand from the Seventh Circuit decision in 2022—and each time the DUSH has either ignored or failed to appreciate the DAB's reasoning.

First, the DUSH states that plaintiff diverted the patient to a different hospital because the FHCC lacked "pediatric capabilities," when in fact the FHCC had "staff trained in Basic Life Support (BLS), as well as Pediatric Life Support (PALS)," "physicians [who] were board certified," and equipment including a "pediatric crash cart, a pediatric GlideScope, and defibrillators." (Sep. 6, 2022 Letter, AR 2302-03, ECF No. 12-7 at 120-21.) The DUSH cites testimony from the FHCC's Chief Medical Executive, Dr. Maldonado, about scenarios in which diversion generally occurs, none of which applied in this case, and states that on April 29, 2017, plaintiff had no information about any trauma or other special issues the incoming infant might have; he knew only that the patient was a seven-month-old infant in cardiac arrest. All this might

11

be true, but none of it gets at plaintiff's core reasoning for diverting the ambulance, and it does not grapple with the DAB's reasoning for why that decision was not medically inappropriate. Plaintiff did not claim to have diverted the ambulance to Lake Forest Hospital because the FHCC lacked the basic training and equipment to resuscitate the patient; instead, he diverted the ambulance to Lake Forest because he judged that the ambulance crew could handle the initial resuscitative efforts and, when it came to providing the care necessary to manage the patient if resuscitative efforts were successful, Lake Forest Hospital's capabilities "far exceed[ed]" those of the FHCC. (Am. DAB Report at 13, AR at 2201, ECF No. 12-7 at 15.) The DUSH does not explain why it would have been obvious to an ordinary person that the DAB'S conclusion that plaintiff's decision-making on this point was appropriate conflicted with the weight of the evidence; he did not grapple with the evidence the DAB principally relied on.

Then, the DUSH cites testimony of Dr. Martin, in which Dr. Martin stated that he believed at the time that the best place for the patient was a trauma center, although he also admitted that he was uncertain about the patient's underlying condition. The DUSH reasoned that Dr. Martin could not conclude that the best place to treat the infant was a trauma center if he admittedly lacked knowledge of whether the infant's condition was the result of trauma. The DUSH's (implicit) reasoning seems to be that plaintiff was wrong to base the diversion on an assumption that the patient had suffered trauma, without being sure. But this ignores the reasons the DAB gave for finding that plaintiff's diversion decision was not medically inappropriate even though it was based on, among other factors, his belief—seconded by Dr. Martin—that the cardiac arrest was most likely caused by trauma. First, the DAB stated that it found—and the DUSH cited—no evidence establishing that plaintiff was incorrect to assume that the most likely cause of the cardiac arrest

12

was trauma; rather, the record lacked the information necessary to conduct a "robust discussion on the etiologies of pediatric arrests," at least in part because the VA had "made no attempt to challenge the validity of this assumption" of a trauma-based injury. (*Id.* at 11, AR at 2199, ECF No. 12-7 at 13.) Second, and more importantly, the DAB reasoned that, whatever the likelihood is, in the abstract, that a given infant's cardiac arrest is caused by trauma, that likelihood was not critical to the diversion decision because the ambulance crew was capable of performing whatever initial resuscitative efforts were necessary, whether the cause of the injury was trauma or not. Therefore, according to the DAB, the diversion decision was appropriately driven by the quality of care available to the patient if those initial resuscitative efforts were successful. Again, instead of grappling with this reasoning, the DUSH merely substituted his own judgment for the DAB's, which the Seventh Circuit specifically stated was an "explicit violation of the statute." *Dubnow*, 30 F.4th at 611. He did not build any "logical bridge between the evidence and the conclusion that the DAB's finding was obviously against the weight of that evidence." *Dubnow*, 30 F.4th at 612 (internal quotation marks omitted).

Next, the DUSH cites the testimony of AIB member Dr. Edward Callahan that "most infant cardiac arrests are respiratory in nature and thus, obtaining airway, oxygen management airway [*sic*] is the most critical thing," so going to "any facility that's closest would be the most appropriate to manage that." (Sep. 6, 2022 Letter, AR 2303-04, ECF No. 12-7 at 121-22 (internal quotation marks omitted).) But Dr. Callahan also testified, as the DAB recognized, that "[p]aramedics would certainly be able to manage an acute pediatric airway," and the DAB found that "the EMS crew was certified and competent" to perform CPR and provide the patient "with effective airway support, ventilation, and oxygenation." (Am. DAB Report at 3, AR at 2191, ECF

13

No. 12-7 at 5 (internal quotation marks omitted).) As a result, the DAB concluded that, "because a fully trained EMS crew would be expected to have a secure airway and provide effective chest compressions during transport, and because of the close proximity of the two hospitals, the time required to travel to Lake Forest Hospital was not a critical factor in determining the outcome of the resuscitation effort." (*Id.*) Again, to the extent that the DUSH's decision is based on his belief that appropriate medical decision-making required plaintiff to direct the ambulance to the closest hospital, it seems that the DUSH improperly substituted his judgment for the DAB's. The statute required the DUSH, in order to reverse the DAB, to "find not only that diversion was inappropriate but also that any conclusion by the DAB to the contrary would appear to the ordinary person to be obviously against the weight of the evidence." *Id.* The DUSH did not explain, and the Court does not see, why it would have been obvious to an ordinary person that the DAB's decision conflicted with the weight of the evidence on this point.

Finally, the DUSH concluded by stating that the VA's "burden of proof in these matters is preponderant evidence. The agency is not required to prove every aspect of a specification. Rather, the agency is only required to prove so much of the specification as is necessary to support the essence of the charge." (Sep. 6, 2022 Letter, AR at 2304, ECF No. 12-7 at 122 (internal quotation marks omitted).) This ignores the "layered" standard of review that the Seventh Circuit instructed the DUSH to apply, and, indeed, it all but turns the standard on its head. The DUSH seems to suggest that it must defer to the initial removal decision, at the expense of the DAB decision, when the reverse is closer to the truth.

In this case, the DUSH has continually persisted in the assumption that appropriate medical decision making required plaintiff to direct the ambulance to bring the infant to a hospital as

14

quickly as possible, although the DAB explicitly found otherwise, after a searching review and lengthy analysis. As plaintiff has explained several times now, his judgment was that he would be able to do little for the patient, as an initial matter, that the ambulance crew was not already doing, so it was more important to take the extra few minutes it would require to get the patient to Lake Forest Hospital, where a more experienced staff would be better able to care for an infant. Despite the Seventh Circuit's explicit admonition, the DUSH has never "grappled" with that reasoning. It has "[m]erely list[ed] a few reasons that support the conclusion opposite the DAB's, without any discussion of the evidence relied on by the DAB," *Dubnow*, 30 F.4th at 612, which does not suffice to demonstrate a rational basis for concluding that the DAB's decision was obviously in conflict with the weight of the evidence. The Court remands this case to the VA again so that it can finally correct this mistake.

### III.  Conclusion

For the reasons set forth above, the Court reverses the VA's decision and remands this case to the VA for further proceedings consistent with this Memorandum Opinion and Order. This case is terminated.

**SO ORDERED.**                                    **ENTERED:  October 18, 2023**

_____
**HON.  JORGE L. ALONSO**
**United States District Judge**